J-A04031-20

2020 PA Super 67

| | | |
|---|---|---|
| GARY SNYDER IN HIS OWN NAME AND DERIVATIVELY ON BEHALF OF CRUSADER SERVICING CORPORATION | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : | |
| CRUSADER SERVICING CORPORATION; ROBERT STEIN; ROYAL BANK AMERICA, JAMES MCSWIGGAN; JOSEPH CAMPBELL; AND MURRAY STEMPEL | : : : : : : : | |
| APPEAL OF: CRUSADER SERVICING CORPORATION AND ROYAL BANK AMERICA | : : : : | No. 1898 EDA 2019 |

Appeal from the Judgment Entered June 19, 2019
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  No. 2007-01027

BEFORE:   PANELLA, P.J., STRASSBURGER, J.[*], and COLINS, J.[*]

OPINION BY COLINS, J.:                      Filed: March 18, 2020

This is an appeal filed by defendant Crusader Servicing Corporation (CSC) and its majority shareholder Royal Bank America (Royal Bank) (collectively, Appellants) from a judgment following a nonjury trial in the Court of Common Pleas of Montgomery County (trial court) in an action brought by Gary Snyder (Plaintiff) against CSC, Royal Bank, CSC director Robert Stein, and three other CSC directors, arising out of the termination of Plaintiff's

---

[*] Retired Senior Judge assigned to the Superior Court.

relationship with CSC. The trial court awarded Plaintiff $2.19 million in damages against CSC for the value of Plaintiff's shares in CSC and prejudgment interest on that amount from December 1, 2006, and ruled in Plaintiff's favor on Appellants' counterclaims. For the reasons set forth below, we vacate the damages judgment in favor of Plaintiff and the trial court's denial of CSC's counterclaim for specific performance and affirm the trial court's judgment in favor of Plaintiff on Appellants' other counterclaims.

The relevant facts found by the trial court are as follows. CSC is a Pennsylvania corporation that was incorporated in July 1996 by Crusader Bank and defendant Stein. Trial Court Decision, 5/1/19, at 2 Findings of Fact (F.F.) ¶¶4, 6. CSC's business is the purchasing and servicing of delinquent property tax liens for profit. *Id.*, at 2-8 F.F. ¶¶6, 8, 11-14, 20, 24; N.T., 11/26/18, at 5, 9-11. Initially, Crusader Bank was a 60% shareholder of CSC and Stein was a 40% shareholder. Trial Court Decision, 5/1/19, at 2 F.F. ¶6.

In October 1996, Plaintiff became a shareholder and director of CSC and the ownership of CSC became 60% Crusader Bank, 20% Stein and 20% Plaintiff. Trial Court Decision, 5/1/19, at 3 F.F. ¶7; CSC Shareholders' Agreement ¶1; N.T., 11/26/18, at 7-9. The Shareholders' Agreement signed by Plaintiff, Crusader Bank, and Stein provides:

> Notwithstanding anything herein to the contrary, in the event of Stein or Snyder's death or total and permanent disability (as defined for Social Security purposes) or the termination of Stein's or Snyder's employment by CSC for cause, CSC shall be required to purchase such party's shares of CSC and such party shall be

required to sell his shares of CSC to CSC in accordance with the price and terms set forth in Paragraph 8 hereunder.

Trial Court Decision, 5/1/19, at 3-4 F.F. ¶9; CSC Shareholders' Agreement ¶7(d). Paragraph 8 of the Shareholders' Agreement provides the following appraisal procedure for determining the value of those shares:

The purchase price per Share shall be equal to the fair market value thereof. The fair market value shall be determined jointly by the parties. In the event the parties are unable to agree on the fair market value, it shall be determined by an independent appraiser experienced in the valuation of financial service entities and the valuation of delinquent property tax certificates. Such appraiser shall be mutually agreed upon by and between all Shareholders of CSC, or failing in agreement, the Selling Shareholder and the purchaser will each choose its own appraiser who will then select the appraiser to determine fair market value.

Trial Court Decision, 5/1/19, at 3-4 F.F. ¶9; CSC Shareholders' Agreement ¶8(c).

Initially, both Stein and Plaintiff attended tax lien sales, but as the business grew, Stein became responsible for more of the operational activity of monitoring the liens after they were acquired and collecting on the liens and Plaintiff assumed responsibility for hiring and supervising the bidders that performed due diligence and bid on the liens. Trial Court Decision, 5/1/19, at 5, F.F. ¶¶12-14. In 2001, Royal Bank acquired assets of Crusader Bank, including Crusader Bank's 60% interest in CSC, and a new board of directors of CSC was established, consisting of Plaintiff, Stein, and three Royal Bank officers. *Id.* at 6 F.F. ¶¶17-19. Royal Bank also established a lending

relationship in 2002 under which it would loan CSC up to $75 million. *Id.* at 7-8 F.F. ¶21.

In 2005, CSC acquired approximately $6 million in liens held by Strategic Municipal Investments (SMI), a group from which CSC had previously acquired liens in 2003, through a $4.9 million increase in its line of credit to SMI (the SMI transaction). Trial Court Decision, 5/1/19, at 8-11 F.F. ¶¶24-32. Plaintiff was required to perform due diligence for the SMI transaction, but did not do any investigation or evaluation of the liens or the properties which were subject to the liens. *Id.* at 11, F.F. ¶¶33-34, 36, at 34 Conclusions of Law (C.L.) ¶¶51-53; N.T., 11/26/18, at 118-20.

At the end of August 2006, Plaintiff agreed to resign from CSC and a tentative agreement was reached that he would be paid $400,000 for his CSC shares. Trial Court Decision, 5/1/19, at 13 F.F. ¶44; N.T.,11/26/18, at 44-48. The proposed settlement agreement sent by Royal Bank, however, contained additional terms that Plaintiff rejected, and no agreement was reached. Trial Court Decision, 5/1/19, at 13 F.F. ¶¶ 46-47. Plaintiff did not receive any payment for his CSC shares. *Id.* at 25 C.L. ¶14; N.T., 11/26/18, at 57. Plaintiff filed for disability benefits and was declared totally disabled as of December 1, 2006. Trial Court Decision, 5/1/19, at 13 F.F. ¶45, at 24 C.L. ¶9; N.T., 11/26/18, at 105.

Following Plaintiff's rejection of the settlement, the remaining CSC board members decided to gradually liquidate CSC and formed a new entity, Royal

Tax Lien Services (RTLS), that was owned 60% by Royal Bank and 40% by Stein and used CSC's offices and employees. Trial Court Decision, 5/1/19, at 13-15 F.F. ¶¶48, 54-57. Before the decision was made to liquidate CSC, an attempt was made to sell its $45 million portfolio of liens, but the offers received were less than CSC's $38 million outstanding debt to Royal Bank. *Id.* at 14 F.F. ¶¶50-51. CSC, however, was not in any financial distress at the time. *Id.* at 14 F.F. ¶52. RTLS serviced CSC's existing liens for a 2% fee and charged CSC a total of over $2.29 million between 2007 and June 2011 for servicing the liens. *Id.* at 13, 15 F.F. ¶¶48, 58-59, 61-62.

Stein and CSC each pled guilty in 2012 to a criminal anti-trust charge arising out of bid-rigging by CSC and other tax lien auction bidders. Trial Court Decision, 5/1/19, at 17-18 F.F. ¶¶69-72; N.T., 11/28/18, at 150; N.T., 11/29/18, at 100. CSC's participation in bid-rigging occurred from at least 1998 through 2006 and involved bidders flipping a coin to determine who would bid on a lien where more than one bidder was interested in the lien, thus eliminating competitive bidding for the liens. Trial Court Decision, 5/1/19, at 16-17 F.F. ¶¶64-66; CSC Plea Agreement ¶1. CSC's plea agreement required it to pay a $2 million fine under a 5-year installment plan. Trial Court Decision, 5/1/19, at 17-18 F.F. ¶¶70-71; CSC Plea Agreement ¶8. CSC made the initial $400,000 payment and RTLS made the remaining payments because CSC did not have the ability to make those payments. Trial

Court Decision, 5/1/19, at 18 F.F. ¶71. Stein's relationship with CSC and RTLS was terminated as a result of the bid-rigging. *Id.* at 18 F.F. ¶¶74-75.

On January 17, 2007, Plaintiff filed this action against CSC, Royal Bank, the three Royal Bank officers who were CSC directors (the Royal Bank affiliated directors), and Stein (collectively, Defendants). In his complaint, Plaintiff alleged that he remained a shareholder and director of CSC, that he was being frozen out of CSC, and that he was wrongfully discharged from his employment with CSC. Complaint ¶¶1, 8-9, 18-19, 63. Plaintiff asserted six causes of action: two claims for inspection of CSC's books and records, one pursuant to his rights as a shareholder and the other in his capacity as a director (Counts I and II); a claim for nonpayment of wages under the Wage Payment and Collection Law, 43 P.S. §§ 260.1-260.12 (Count III); a breach of contract claim that asserted that non-payment of his salary was a breach of his employment contract with CSC (Count IV); a breach of fiduciary duty claim based on the alleged freeze out, seeking as damages his proportional share of CSC losses and reduced profits caused by Defendants and his share of distributions (Count V); and a shareholder's derivative claim (Count VI). Complaint ¶¶27-68. Plaintiff did not allege in the Complaint that he had been declared disabled or assert any claim for the value of his CSC shares or that Defendants were liable for breach of contract for failure to buy back his shares.

Defendants filed an answer in which they denied that Plaintiff was still a shareholder, director, or employee of CSC and alleged that Plaintiff had

resigned and agreed to a settlement under which he would surrender his CSC shares in exchange for payment of $400,000 plus the $27,000 proceeds of a September 2006 sale of a property and a release of claims against him relating to the SMI transaction. Answer and New Matter Answer ¶¶1, 8-9, 18-20, New Matter and Counterclaims ¶¶3, 6, 27-28, 36. Defendants asserted a counterclaim for enforcement of the alleged settlement agreement, an alternative breach of fiduciary duty counterclaim for damages with respect to the SMI transaction, if the settlement was not enforced, and a counterclaim for conversion of property of CSC that Plaintiff allegedly took when he cleaned out his office. *Id.* New Matter and Counterclaims ¶¶34-46. In their answer, Defendants did not request valuation of Plaintiff's shares pursuant to the CSC Shareholders' Agreement.

Defendants raised the argument that the value of Plaintiff's shares must be set in accordance with Paragraph 8(c) of the Shareholders' Agreement in a motion response filing in February 2010. Docket Entry 92, Answer Motion to Lift Stay ¶7. On August 14, 2012, Defendants filed a motion for summary judgment asserting that Plaintiff's sole remedy was to obtain payment for his CSC shares pursuant to the valuation procedures in Paragraph 8(c) of the CSC Shareholders' Agreement, based on Plaintiff's testimony in his deposition taken in June 2011 that he had left CSC because he was totally disabled and had been declared totally disabled. Docket Entry 126 Defendants' Motion for Summary Judgment ¶¶7, 13-16, 18, 22-23 & Ex. C. Plaintiff in response

asserted that Defendants ignored and refused to follow the valuation procedure, but also argued that the summary judgment motion was premature because discovery on Stein's 2012 bid-rigging plea was necessary, that there were issues of fact concerning Plaintiff's departure from CSC, and that the valuation procedure did not apply to a freeze out or the other claims asserted by Plaintiff. Docket Entry 127 Answer to Defendants' Motion for Summary Judgment ¶¶4-5, 7, 11, 13-14, 16, 19, 22. Plaintiff also moved in November 2012 for leave to file an amended complaint to add allegations and claims concerning the bid-rigging. The trial court denied Defendants' motion for summary judgment without opinion and on March 8, 2013, granted Plaintiff leave to file an amended complaint. Trial Court Order, 12/10/12; Trial Court Order, 3/8/13.

On March 12, 2013, Plaintiff filed his amended complaint. The amended complaint added averments concerning the bid-rigging, Amended Complaint ¶¶ 27-30, 60, 62, 71, but pled the same six causes of action as his original complaint. *Id.* ¶¶31-73. As in his original complaint, Plaintiff alleged that he was still a shareholder of CSC, *id*. ¶¶1, 8, 57-58, and did not assert any claim for the value of his CSC shares or that Defendants were liable for breach of contract for failure to buy back his shares. The amended complaint sued the same six defendants as the original complaint; Plaintiff did not join RTLS as a defendant.

In their answer to the amended complaint, Appellants and the Royal Bank affiliated directors pled that Plaintiff was totally disabled and was therefore required to sell his shares to CSC in accordance with the Shareholders' Agreement. CSC & Royal Bank Defendants' Answer and New Matter to Amended Complaint, New Matter ¶16, Counterclaims ¶¶2, 39, 67. Appellants asserted four counterclaims in this answer: the counterclaims for enforcement of the alleged settlement agreement and for damages for breach of fiduciary duty with respect to the SMI transaction that they had pled in their original answer, a claim for breach of fiduciary duty based on Plaintiff's alleged involvement in the bid-rigging, and a claim for specific performance seeking to enforce the procedure under Paragraph 8(c) of the Shareholders' Agreement for determining the fair value that Plaintiff is to be paid for his CSC shares. *Id.*, Counterclaims ¶¶48-67.

Between May 22, 2013 and May 9, 2016, the case was at least partially stayed as a result of Stein's plea and his cooperation with the U.S. Department of Justice in the bid-rigging case until after his sentencing in April 2016. On March 15, 2017, Appellants and the Royal Bank affiliated directors filed a second summary judgment motion reasserting that Plaintiff's sole remedy was to obtain payment for his CSC shares pursuant to the valuation procedures in Paragraph 8(c) of the CSC Shareholders' Agreement. Docket Entry 177 Renewed Motion for Summary Judgment. The trial court denied this summary judgment motion without opinion. Trial Court Order, 5/18/17.

The trial court held a four-day bench trial of Plaintiffs' claims against Defendants and Defendants' counterclaims from November 26 to 29, 2018. At or before trial, Plaintiff discontinued his Count I and II claims for inspection of CSC's books and records and his Count III Wage Payment and Collection Law claim. 11/28/18, at 9. Eight witnesses testified at trial: Plaintiff, Stein, one of the Royal Bank affiliated directors, two former CSC employees with knowledge of the bid-rigging, a Royal Bank financial officer, Plaintiff's valuation expert, and Defendants' valuation expert. At the close of Plaintiff's case, Plaintiff, with the consent of all parties, discontinued his claims against the Royal Bank affiliated directors, leaving CSC, Royal Bank, and Stein as the only defendants. *Id.* 9-10.

On May 1, 2019, the trial court issued its verdict. The trial court found in favor of Plaintiff and against CSC on one claim, a claim for breach of contract against CSC alone, based on CSC's failure to buy back Plaintiff's shares on December 1, 2006. Trial Court Decision, 5/1/19, at 22-27 C.L. ¶¶2-32. The trial court concluded that CSC breached the Shareholders' Agreement because it was required to purchase Plaintiff's CSC shares for fair market value when Plaintiff was declared permanently disabled, and held that the court was not bound by the Shareholders' Agreement valuation procedure because CSC had breached the Shareholders' Agreement. *Id.* at 24-27 C.L. ¶¶7, 12, 14, 22-26. The trial court found Plaintiff's expert's valuation of Plaintiff's CSC shares at $2.19 million credible, rejected Defendants' expert's opinion that the CSC

shares had no value as not credible, and awarded Plaintiff damages of $2.19 million. *Id.* at 25, 27, 36 C.L. ¶¶15, 27 & Order. The trial court also concluded that Plaintiff was entitled to pre-judgment interest on this amount at the statutory interest rate of 6% from December 1, 2006. *Id.* at 27, 36 C.L. ¶¶28-32 & Order. The trial court rejected Plaintiff's breach of contract claim with respect to his employment on the ground that Plaintiff's employment terminated when he became disabled and buyout was required, and rejected Plaintiff's breach of fiduciary duty and derivative claims on the ground that Plaintiff was no longer a shareholder after his disability. *Id.* at 24, 31-33 C.L. ¶¶8-11, 42-44, 46.

The trial court rejected all of Defendants' counterclaims. The trial court held that Defendants failed to prove that there was a settlement and that they were not entitled to specific performance of the Shareholders' Agreement valuation procedure because CSC had breached the Shareholders' Agreement and damages for breach of contract provided an adequate remedy. Trial Court Decision, 5/1/19, at 26-27, 33, 35-36 C.L. ¶¶22-26, 47, 62-65. With respect to the breach of fiduciary duty counterclaims concerning the SMI transaction and bid-rigging, the trial court found that Plaintiff failed to perform due diligence in the SMI transaction and that this constituted a breach of fiduciary duty. *Id.* at 34 C.L. ¶¶51-53. The trial court concluded, however, that Defendants failed to prove that CSC suffered any damages from this breach of fiduciary duty because they did not prove what the value of the SMI lien

portfolio was. *Id.* at 34-35 C.L. ¶¶55-58, 61. On the bid-rigging counterclaim, the trial court found that the evidence did not show that Plaintiff engaged in or condoned illegal bid-rigging and did not show that the fine was caused by Plaintiff's conduct. *Id.* at 35 C.L. ¶¶59-61.

Both CSC and Plaintiff filed post-trial motions. In its post-trial motion, CSC sought entry of judgment in its favor and raised all of the issues that it argues in this appeal. Plaintiff in his post-trial motion argued that he remained a shareholder and that the trial court erred in rejecting his breach of fiduciary duty claim and derivative action claim. The trial court denied both post-trial motions. Trial Court Order, 5/29/19; Trial Court Order, 6/4/19. Judgment was entered in Plaintiff's favor and against CSC on May 30, 2019 in the amount of $2,190,000.00 in damages and $1,653,021.00 in interest through May 30, 2019. On June 19, 2019, judgment was entered on all remaining claims, in favor of Defendants and against Plaintiff on Plaintiff's claims other than Count IV of his amended complaint and in favor of Plaintiff and against Appellants on their counterclaims. Appellants filed a timely notice of appeal from this judgment.[1]

---

[1] Appellants filed a timely concise statement of errors complained of on appeal that included all issues that they argue in this Court. Plaintiff also filed a timely appeal that was consolidated with this appeal, but he failed to comply with the trial court's Pa.R.A.P. 1925(b) order and discontinued his appeal on September 5, 2019.

In this Court, Appellants raise the following four issues for our review: 1) whether the trial court erred in awarding damages rather than enforcing the Shareholders' Agreement's valuation procedure; 2) whether the trial court erred in its determination that the value of Plaintiff's CSC shares was $2.19 million; 3) whether the trial court erred in holding that plaintiff's claim was not barred by his wrongful conduct; and 4) whether the trial court erred in entering judgment for Plaintiff on Appellants' breach of fiduciary duty counterclaims. Appellants' Brief at 2-3. We conclude that the trial court erred in not enforcing the valuation procedure set forth in Paragraph 8(c) of the Shareholders' Agreement and in awarding damages to Plaintiff on a basis outside that procedure. We conclude, however, that the trial court committed no error in its conclusion that Appellants failed to prove all of the elements of their breach of fiduciary duty counterclaims.[2]

---

[2] In light of our conclusion that Plaintiff is limited to the valuation procedure in the Shareholders' Agreement, we need not and do not address Appellants' arguments concerning the value of Plaintiff's CSC shares. It also appears that Appellants' contention that Plaintiff was barred from recovering damages by his misconduct is rendered moot by our resolution of Appellants' first issue. In any event, to the extent that Appellants contend in their third issue that Plaintiff's misconduct also bars him from receiving payment for the value of his shares under the Shareholders' Agreement, such an argument would be without merit. The defense of *in pari delicto* bars a plaintiff from recovering damages only where the plaintiff was an active, voluntary participant in wrongful conduct or a wrongful transaction for which he seeks redress and the plaintiff was substantially equally or more responsible for the wrongful conduct than the defendant. ***Official Committee of Unsecured Creditors of Allegheny Health Education & Research Foundation v. PriceWaterhouseCoopers, LLP***, 989 A.2d 313, 317, 328-29 (Pa. 2010)

This Court's review of the trial court's judgment here is limited to examining whether the trial court's factual determinations are supported by competent evidence and whether the trial court committed an error of law. *Hornberger v. Dave Gutelius Excavating, Inc.*, 176 A.3d 939, 943 (Pa. Super. 2017); *Boehm v. Riversource Life Insurance Co.*, 117 A.3d 308, 321 (Pa. Super. 2015). The trial court in a nonjury trial is free to believe all, part, or none of the testimony presented at trial, and this Court may not reweigh the evidence or substitute its judgment for that of the trial court. *Linde v. Linde*, 220 A.3d 1119, 1151 (Pa. Super. 2019). The interpretation of a contract, however, is an issue of law over which our review is plenary. *Hornberger*, 176 A.3d at 944.

Appellants argue that the because the trial court found only a breach of the Shareholders' Agreement's requirement that CSC buy back Plaintiff's shares, it was required to enforce the valuation procedure in Paragraph 8(c)

---

(addressing applicability of *in pari delicto* to claims against auditors for assisting a corporate officer in falsifying the corporation's finances); *see also Joyce v. Erie Insurance Exchange*, 74 A.3d 157, 162-66 (Pa. Super. 2013) (action to recover restitution that plaintiff was ordered to pay in criminal case barred by *in pari delicto*); *Brickman Group, Ltd. v. CGU Insurance Co.*, 865 A.2d 918, 920, 923-26 (Pa. Super. 2004) (action for breach of illegal agreement to freeze insurance premiums barred by *in pari delicto*). Plaintiff's right under the Shareholders' Agreement to be paid the value of his shares is not a cause of action arising out of any wrongful act. Plaintiff's wrongful acts relate solely to the SMI transaction and bid-rigging, and payment of the value of Plaintiff's shares is not redress for the SMI transaction or bid-rigging. The requirement that the plaintiff was an active, voluntary participant in wrongful conduct or a wrongful transaction for which he seeks redress is therefore not met.

of the Shareholders' Agreement and could not award damages on a basis outside that procedure. We agree.

Where a party asserts a claim for the value of his interest in a business entity that is governed by a shareholders' agreement, the valuation is subject to the buy and sell provisions of the agreement creating that interest, if the agreement provides a valuation method that can be enforced. *Hornberger*, 176 A.3d at 944-45 (upholding valuation of shares by corporation's independent accountant where shareholders' agreement provided for purchase price to be set by corporation's independent accountant and adjustments made by accountant were consistent with professional valuation methods and not prohibited by the agreement); *Olson v. North American Industrial Supply, Inc.*, 658 A.2d 358, 360-63 (Pa. Super. 1995) (buy-back agreement unenforceable where it required inclusion in purchase price of current valuation of goodwill set by the corporation and no current valuation of goodwill had been set by the corporation); *Osborne v. Carmichaels Mining Machine Repair, Inc.*, 628 A.2d 874, 876-79 (Pa. Super. 1993) (upholding trial court's valuation of shares based on language of shareholders' agreement buy-back provision and court's interpretation of ambiguous term in agreement). "In interpreting the value of shares pursuant to a stock redemption agreement, our only useful authority is the language of the agreement itself." *Hornberger*, 176 A.3d at 944 (bracket omitted and capitalization adjusted) (quoting *Osborne*); *Osborne*, 628 A.2d at 877. *See*

*also McCabe v. McCabe*, 575 A.2d 87, 89 (Pa. 1990) (holding that partnership agreement determined value of partnership interest in divorce equitable distribution, stating that "[t]he substantive rights of a partner consist only of those specified in the partnership agreement, and, in appraising this bundle of rights, the agreement cannot be disregarded").

Here, the language of the Shareholders' Agreement makes clear that the valuation procedure for CSC's buy-back of its shares must be followed. The provision of the Shareholders' Agreement on which the trial court based its liability finding, Paragraph 7(d), provided that "CSC **shall be required to purchase** such party's shares of CSC and such party **shall be required to sell** his shares of CSC to CSC **in accordance with the price and terms set forth in paragraph 8 hereunder**." CSC Shareholders' Agreement ¶7(d) (emphasis added). Paragraph 8(c) sets forth the valuation procedure in mandatory terms:

> The purchase price per Share **shall** be equal to the fair market value thereof. The fair market value **shall** be determined jointly by the parties. In the event the parties are unable to agree on the fair market value, it **shall** be determined by an independent appraiser experienced in the valuation of financial service entities and the valuation of delinquent property tax certificates. Such appraiser **shall** be mutually agreed upon by and between all Shareholders of CSC, or failing in agreement, the Selling Shareholder and the purchaser **will** each choose its own appraiser who **will** then select the appraiser to determine fair market value.

*Id.* ¶8(c) (emphasis added).

The trial court's judgment did not comply with the Shareholder's Agreement's mandatory remedy for the buy-back of Plaintiff's shares that it

- 16 -

found was required by Plaintiff's disability. Not only did the trial court deny CSC's counterclaim for specific enforcement of the Shareholders' Agreement's valuation procedure and determine the value of the shares itself, but it made its valuation based on an appraisal that violated the Shareholder Agreement. Paragraph 8(c) of the Shareholder Agreement requires that fair market value of CSC shares be determined by an "appraiser experienced in the valuation of financial service entities and the valuation of delinquent property tax certificates." Plaintiff's expert, whose valuation the trial court adopted, did not meet these qualifications, as he testified that he was not sure whether he had ever done any valuations of financial service entities and admitted that he had no experience in the valuation of delinquent property tax certificates. Trial Court Opinion at 22; N.T., 11/27/18, at 145.

The sole ground on which the trial court justified its failure to enforce and limit Plaintiff's remedy to the Shareholder Agreement's valuation procedure was its conclusion that Defendants breached the Shareholders' Agreement in not buying back Plaintiff's shares after Plaintiff was declared permanently disabled in December 2006. Trial Court Opinion at 22; Trial Court Decision, 5/1/19, at 24-27 C.L. ¶¶12, 14, 22-26. This determination, however, is not supported by the record.

Paragraph 7(d) of the Shareholders' Agreement imposes obligations on both CSC and the shareholder with respect to the repurchase of shares; in the event of Plaintiff's total and permanent disability, CSC was required to

- 17 -

purchase Plaintiff's shares and Plaintiff was required to sell his shares back to CSC. There is no evidence that Plaintiff notified CSC that he had been declared totally disabled before he filed this action or that he offered to sell his shares back to CSC after he was declared disabled. Plaintiff raised the issue of an appraisal under the Shareholders' Agreement on November 13, 2006, in a response to Defendants' proposed revisions to the parties' settlement agreement, stating that Plaintiff "has determined that the proposed resolution of this matter … is not acceptable" and that Plaintiff "has determined that a fair market appraisal of [his] stock in the Company, which is the mechanism contemplated by the existing and binding Shareholders' Agreement of the Company, is the more appropriate and equitable basis for all parties to determine the purchase price." Plaintiff's Counsel's 11/13/06 Letter. Plaintiff, however, had not yet been declared disabled in November 2006. After Plaintiff was declared disabled on December 1, 2006, he did not notify CSC of that fact and offer to sell back his shares under Paragraphs 7(d) and 8 of the Shareholders' Agreement. Instead, new counsel for Plaintiff sent a letter asserting that Plaintiff had been "discharged" and "locked out" and stating with respect to purchase and valuation of Plaintiff's CSC shares only the following, without disclosing the disability declaration:

> If your clients have an interest in purchasing my client's shares of [CSC], I will require that you so state in writing, including the purchase price which they are willing to pay. If your clients contend that they have a contractual right to purchase my client's interest, then I require formal written demand for such right,

which would include the reasons your clients believe this right exists.

Plaintiff's Counsel's 12/11/06 Letter.

Moreover, Plaintiff in his complaint did not plead that he was disabled or that he offered to sell his shares back to CSC and did not plead any claim that CSC breached an obligation to purchase his shares. Instead, Plaintiff asserted only claims that were inconsistent with complying with his obligations under Paragraphs 7(d) and 8 of the Shareholders' Agreement. In both his 2007 original complaint and his 2013 amended complaint, Plaintiff alleged that he was still a shareholder of CSC and asserted only claims for inspection of CSC's books and records, a Wage Payment and Collection Law claim, a breach of contract claim that asserted that non-payment of his salary was a breach of an employment contract with CSC, a breach of fiduciary duty claim seeking as damages amounts to which he claimed to be entitled as a CSC shareholder, and a shareholder's derivative claim. Complaint ¶¶1, 8, 18-22, 27-68; Amended Complaint ¶¶1, 8, 31-73.

The only breach of contract claim that Plaintiff asserted consisted of the following averment:

> Defendant [CSC]'s failure to pay plaintiff's salary subsequent to his dismissal is a violation of the terms of the Employment Contract in that plaintiff was not dismissed as a result of a For Cause Event.

Complaint ¶51; Amended Complaint ¶55. Breach of the buy-back provision of the Shareholders' Agreement was before the trial court only because this

issue was raised by Defendants in 2013, as a breach by Plaintiff, in Defendants' specific performance counterclaim in their answer to Plaintiff's amended complaint. CSC & Royal Bank Defendants' Answer and New Matter Amended Complaint, Counterclaims ¶¶64-67.

In sum, the record shows that Plaintiff contributed to CSC's failure to promptly invoke the Shareholder's Agreement's valuation procedure by not notifying CSC of the disability declaration that triggered CSC's buy-back obligation and by not offering to sell back his shares after the disability declaration. Notwithstanding these facts and Plaintiff's affirmative allegations that he was entitled to remain a shareholder, since at least February 2010, over eight years before the trial in this action, CSC consistently and repeatedly asserted that the value of Plaintiff's CSC shares must be determined under the Shareholders' Agreement valuation procedures. Docket Entry 92, Answer Motion to Lift Stay ¶7; Docket Entry 126 Defendants' Motion for Summary Judgment ¶¶7, 13-16, 18, 22-23; CSC & Royal Bank Defendants' Answer and New Matter Amended Complaint, Counterclaims ¶¶39, 64-67; Docket Entry 177 Renewed Motion for Summary Judgment. Under these circumstances, CSC's conduct cannot constitute a waiver of the mandatory procedure set forth by the Shareholder's Agreement for the valuation of Plaintiff's CSC shares.

Because the trial court found CSC liable to Plaintiff only under the Shareholder's Agreement provision requiring it to buy back Plaintiff's shares once he had been determined to be totally disabled and CSC was not barred

from seeking enforcement of Shareholder's Agreement's requirements, the trial court erred in awarding damages in contravention of the mandatory valuation procedure prescribed in Paragraph 8(c) of the Shareholder's Agreement.

Moving to the remaining issue in this appeal, Appellants' contentions that the trial court erred in rejecting their breach of fiduciary counterclaims are without merit. To prevail on their breach of fiduciary duty claims, Appellants were required to prove the following elements: the existence of a fiduciary relationship between Plaintiff and CSC, that Plaintiff negligently or intentionally failed to act in good faith and solely for CSC's benefit, and that CSC suffered an injury caused by Plaintiff's breach of his fiduciary duty. *Kirschner v. K & L Gates LLP*, 46 A.3d 737, 757-58 (Pa. Super. 2012); *Kaplan v. Cairn Terrier Club of America*, 2017 WL 2729667 at *3-*4 (Pa. Cmwlth. No. 218 C.D. 2017, filed June 26, 2017); *Dinger v. Allfirst Financial, Inc.*, 82 Fed. Appx. 261, 265 (3d Cir. 2003).[3] The trial court's

---

[3] To the extent that Royal Bank was also a plaintiff on the bid-rigging counterclaim, it was required to prove that Plaintiff had a fiduciary relationship with it, a failure by Plaintiff to act solely for its benefit, and damage to it, Royal Bank, as opposed to CSC. We need not evaluate Royal Bank's counterclaim, however, because Royal Bank did not file any post-trial motion and therefore has not preserved any issue for appellate review. *Chalkey v. Roush*, 805 A.2d 491, 494-96 (Pa. 2002); *L.B. Foster Co. v. Lane Enterprises, Inc.*, 710 A.2d 55 (Pa. 1998); *Diamond Reo Truck Co. v. Mid–Pacific Industries, Inc.*, 806 A.2d 423, 428-31 (Pa. Super. 2002).

findings that Appellants failed to prove all of these elements are supported by the record.

With respect to the SMI transaction counterclaim, the trial court found that CSC proved that Plaintiff owed CSC a fiduciary duty and breached his fiduciary duty to CSC in the SMI transaction, but that CSC failed to prove the element of injury because it did not introduce evidence sufficient to show the value of the liens that it acquired or what, if any loss, it suffered. Trial Court Decision, 5/1/19, at 34-35 C.L. ¶¶51-53, 55-58, 61; Trial Court Opinion at 29-30. Contrary to Appellants' assertions in their briefs, the trial court's reference to "a significant amount of loss" was not a finding that CSC suffered a significant net loss on the SMI transaction. Rather, this was a reference to a significant amount of the SMI portfolio being worthless.[4] This fact, without quantification of the amount of worthless liens, did not show that CSC sustained a loss, as the evidence showed that CSC believed when it acquired the SMI portfolio that a significant amount of the liens were worthless and

---

[4] The trial court's statement in context was:

> Here, this Court was presented with no evidence of an amount or percent of the SMI portfolio that was worthless. The Defendants asked for the full value of the portfolio as damages while the evidence at trial was obvious that the portfolio had at least some value, possibly a significant amount of value. While it is true that there was also a significant amount of loss, this Court would have been forced to speculate as to whether $500,000 of the portfolio was worthless, or whether the amount of the damages was closer to $3.5 million or more.

Trial Court Opinion at 30.

based the amount that it advanced for the portfolio on that belief, and the evidence also showed that SMI reimbursed CSC with respect to some additional worthless liens.  N.T., 11/26/18, at 122-23; N.T., 11/28/18, at 80-81, 95.

The determination of damages is within the trial court's exclusive authority as fact-finder to weigh and assess the credibility of the evidence. **Boehm**, 117 A.3d at 328; **Lou Botti Construction v. Harbulak**, 760 A.2d 896, 898 (Pa. Super. 2000).  No damages may be awarded where the evidence is insufficient for the finder of fact to determine what, if any amount, of damages the plaintiff suffered.  **Printed Image of York, Inc. v. Mifflin Press, Ltd.**, 133 A.3d 55, 60-61 (Pa. Super. 2016).

Appellants argue that the trial court was required to find damages because the burden of uncertainty of damages should fall on the wrongdoer. This, however, was not a case where damages were difficult to determine. What value CSC received in the SMI transaction and whether it sustained a loss were quantifiable and CSC had greater knowledge of its damages than Plaintiff.  CSC's problem in proving damages is that it failed to introduce evidence concerning the value of the SMI liens.  CSC in fact had an expert value the SMI portfolio, but did not call him as a witness at trial.  N.T., 11/28/18, at 3, 194-201.

The only evidence that Appellants contend that they introduced of the amount of CSC's loss on the SMI transaction consists of the fact that CSC

recorded charge-offs of over $4 million on the SMI transaction over a period of 8 years, beginning in 2009. N.T., 11/29/18, at 94; Defendants' Ex. 66. That evidence does not show that the losses were due to invalid liens or inadequate due diligence, as opposed to subsequent adverse changes in the value of real estate that secured valid liens. Indeed, Plaintiff introduced evidence that after Defendants claimed they discovered that SMI liens were defective, Royal Bank in 2008 reported in an SEC statement that "[s]ince the outstanding balance of the CSC loan to SMI is $6.8 million and is secured by real property having an approximate fair market value of $17 million, no provision for lien losses was recorded." N.T., 11/27/18, at 30-31.

With respect to Appellants' bid-rigging counterclaim, the trial court found that the evidence did not show sufficient involvement by Plaintiff to constitute a breach of fiduciary duty because it showed at most that Plaintiff had some knowledge that bid-rigging occurred but did not condone it. Trial Court Decision, 5/1/19, at 18 F.F. ¶76, at 35 C.L. ¶59; Trial Court Opinion at 26, 30. In addition, the trial court concluded that the criminal fine assessed against CSC and paid by CSC and RTLS was not caused by Plaintiff's limited involvement, as opposed to Stein's conduct, because Plaintiff was never charged in the bid-rigging investigation. Trial Court Decision, 5/1/19, at 35 C.L. ¶¶60-61; Trial Court Opinion at 30. These findings are supported by the evidence at trial. Plaintiff testified only that he heard about some bid-rigging

- 24 -

and advised employees not to do it, and the trial court found Plaintiff's testimony credible. N.T., 11/ 26/ 18 at 67; Trial Court Opinion at 26.

Because the trial court erred in disregarding the CSC Shareholders' Agreement and valuing Plaintiff's CSC shares itself, we vacate the damages judgment in favor of Plaintiff and remand this case for the trial court to order the parties to comply with Paragraph 8(c) of the Shareholders' Agreement. Because the trial court's findings that CSC failed to prove all essential elements of its breach of fiduciary duty claims against Plaintiff are supported by the evidence at trial, we affirm the judgment in favor of Plaintiff and against Appellants on those counterclaims.

Judgment vacated in part and affirmed in part. Case remanded for further proceedings consistent with this opinion on Plaintiff's claim against Crusader Servicing Corporation only. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/18/20